ALUMINUM FLAKE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4669, 8444. Promulgated April 30, 1927.

The value for invested capital purposes of a clay deposit paid in for stock in 1903 determined.

*Herbert D. Cohen, Esq.,* for the petitioner.
*Shelby S. Faulkner, Esq.,* for the respondent.

These proceedings are for the redetermination of deficiencies in income and profits taxes for the fiscal years ended May 31, 1918, 1919, and 1920, in the amounts of $3,850.65, $1,608.84, and $4,049.28, respectively. The sole issue presented is the value for invested capital purposes of property paid in for stock.

### FINDINGS OF FACT.

The petitioner is a Maine corporation organized May 25, 1903, as the American Kaolin Co., its principal office being located at Akron, Ohio. On June 7, 1905, the name was changed to the Aluminum Flake Co. The authorized capital stock when incorporated was 5,000 shares, par value $100 per share.

For several years prior to 1903, Frank Reifsnider had been experimenting with clay taken from a large deposit found on his property. The property was located near Warrenton, Mo., and consisted of approximately 807 acres, of which Reifsnider owned approximately 415 acres and held the balance under lease. Reifsnider had formerly been superintendent of a rubber manufacturing concern and made a number of experiments which proved that this particular clay could be used in the manufacture of rubber goods and in paints He perfected certain machinery which would pulverize the clay so that the same could be used for this and other purposes.

The deposit of clay had been examined by a number of geologists and clay experts and numerous samples had been chemically analyzed. The examination disclosed some seventeen pits and outcroppings of the clay deposits and at least one of the pits had been worked since 1885 without being exhausted. A number of estimates had been made as to the tonnage of clay available, the minimum estimate being 170,000 tons, while the largest was in excess of 2,000,000 tons. One of the examinations was conducted by the Missouri State Geological Survey during the years from 1890 to 1895, and in their report of the survey the quantity of clay in this deposit was estimated to be in excess of 2,000,000 tons. The analyses proved that the deposit was of exceptionally high-grade flint clay, and the experiments conducted by Reifsnider developed additional uses for the clay which up to this time had been principally used for fire brick. The official

report of the Missouri State Geological Survey published in 1900 stated that the Reifsnider deposit was " one of the most remarkable clay deposits in the known world.  *  *  *  It consists of several hundred acres of Lorraine Shales, in place, altered into a fine white plastic clay, suitable for almost any ceramic purpose. The original shale bed was about 60 feet thick and had an exposed area of 500 or 600 acres. The supply is, therefore, practically inexhaustible."

The directors of the corporation in 1903 were William H. Hoover, Frank Reifsnider, Charles Reifsnider, Nathaniel P. Goodhue, and William E. Young. Frank Reifsnider offered to convey to the corporation his property and leaseholds containing the clay deposits in consideration for $400,000 of the capital stock of the corporation. This offer was accepted by the directors of the corporation and a transfer made. At the same meeting at which the directors authorized the purchase of the Reifsnider property with capital stock of the corporation, which was held on May 28, 1903, the directors authorized the sale of $50,000 of the capital stock at $33.33⅓ per share. Within the year, the directors authorized the sale of a smaller block of stock at $50 per share. The proceeds of these sales were used in developing the clay deposit near Warrenton, and establishing and equipping a plant at Akron, Ohio.

The raw clay in the Reifsnider deposit was mined and loaded on railway cars at the deposit, which had a spur track connecting with the railroad. The clay was then shipped to Akron where it was cleaned and brushed, and after being milled, was sacked for sale. Reifsnider, before incorporating the American Kaolin Co., had ascertained that manufacturers of rubber goods could use this particular clay, and that they would pay $20 to $30 per ton for the same f. o. b. Akron. In 1903 the sacked clay was selling for $35 per ton, while the clay dust, a by-product, brought $40 to $50 per ton. The raw clay could be mined for from 50 cents to $1 per ton, depending on the length of the haul from the pit to the car. The raw clay was selling for $1.50 to $2.50 per ton f. o. b. shipping point. Farmers in the community mined the raw clay at irregular intervals from other good deposits located in the same vicinity. The quantity of clay mined by the farmers was contingent upon the condition of their crops and the roads over which they had to haul the clay to the cars. Clay brought in by the farmers was purchased by the petitioner and other interests using the same.

The following table shows the quantities of clay sold by the petitioner from September 1, 1903, through May 31, 1919:

|  | Tons. |
| --- | --- |
| Sept. 1, 1903, to May 31, 1904 | 35 |
| Year ended May 31, 1905 | 83 |
| Year ended May 31, 1906 | 304 |

|  |  | Tons. |
|---|---|---|
| Year ended May 31, 1907 | | 569 |
| Year ended May 31, 1908 | | 351 |
| Year ended May 31, 1909 | | 633 |
| Year ended May 31, 1910 | | 775 |
| Year ended May 31, 1911 | | 826 |
| Year ended May 31, 1912 | | 1,195 |
| Year ended May 31, 1913 | | 1,543 |
| Year ended May 31, 1914 | | 1,539 |
| Year ended May 31, 1915 | | 1,281 |
| Year ended May 31, 1916 | | 2,622 |
| Year ended May 31, 1917 | | 2,527 |
| Year ended May 31, 1918 | | 3,169 |
| Year ended May 31, 1919 | | 2,801 |
| Total | | 20,253 |

Of the foregoing total only 3,576 tons were mined from the Company's deposit, the balance either having been purchased, or obtained from the leases. For the last few years practically no clay had been obtained from the leases, all of it being purchased from producers in the surrounding territory. However, the leases are still in effect and the Company may at any time obtain clay from them.

On September 23, 1914, the petitioner amended its by-laws whereby capital stock was arbitrarily reduced from $500,000 to $50,000. On October 5, 1914, entries were made in the books to reflect this adjustment, and real estate was reduced from the $400,000 value at which the deposit had been carried to $15,000. Thereafter, on July 22, 1918, the directors arbitrarily increased the capital stock by adding $100,000 to the then book value of its clay deposit.

The value of the property acquired for stock in 1903 was at least $138,840. The respondent valued the property at $15,000 in computing invested capital.

#### OPINION.

MORRIS: The issue raised is the value to be used, in computing invested capital, of the Reifsnider property which was paid in for $400,000 of the capital stock of the petitioner. In support of its valuation the petitioner offered evidence of the sale of certain shares of stock at or about the same time the property was acquired for $33.33⅓ per share and $50 per share. The petitioner also offered the testimony of two of its original incorporators and various corporate officials, and the expert testimony of a consulting engineer and geologist. The respondent relies upon the valuation made by the board of directors in 1914, when capital stock was reduced from $500,000 to $50,000, and the property was valued on taxpayer's books at $15,000.

The rule of law seems to be well settled that the valuation of property placed thereon by the board of directors in the exercise of their best judgment is evidence of actual value, but where the direc-

tors have arbitrarily placed successive valuations upon the property, the probative weight of any one of the values so fixed is lessened by each additional valuation. In the instant proceeding the board of directors have placed three separate values on the property as shown by their books. Any one of the values so fixed carries no greater weight than the other two so that if we would fix the value of the property, we must look to evidence other than the determination of the board of directors.

The best evidence of value adduced was the expert testimony of H. A. Wheeler, a consulting engineer and geologist. Wheeler was a graduate mining engineer with some 40 or more years of experience. He was with the United States Geological Survey; he was an organizer and the first president of the American Ceramic Society; he has been a manufacturer in the clay industry for many years; he has been professor of geology and mining at Washington University, St. Louis, Mo., for 12 years, and he was engaged by the State of Missouri to work up the clay resources of that State with the State Geological Survey. In the latter work he visited during 1890 to 1895 the clay deposits of Missouri, examining and analyzing the deposits and samples of the clay. He testified that the Reifsnider deposit was "the richest and most extensive of the flint clay deposits known at that time," that the tonnage of clay available was approximately 200,000 tons, that the clay in place was worth at least $1 a ton, and that land as rich in clay as the Reifsnider property was conservatively worth $200 per acre. He further testified that he had intended acquiring the Reifsnider property but was unable to do so because of a lack of capital. Also that the railroad connections which the Reifsnider properties had made the clay deposit much more valuable than the same property would be without such transportation facilities.

The petitioner is here alleging that this property should be valued at $138,840 in 1903. The evidence of the officers and directors and the expert testimony points conclusively to the fact that this value should be allowed. We are of the opinion, therefore, that the petitioner has sustained its allegations and that in computing invested capital the property paid for stock should be valued as claimed.

*Judgment will be entered for the petitioner on 15 days' notice, under Rule 50.*